UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

THOMPSON, I.G., L.L.C.,

        Plaintiff,                              Case No: 11-12839

vs.                                                 HON. AVERN COHN

EDGETECH I.G., INC.,

        Defendant.
_____/

**MEMORANDUM AND ORDER DENYING DEFENDANT'S
MOTION FOR SPOILATION AND FRAUD ON THE COURT
SANCTIONS (Doc. 77) AND DEFERRING RULING ON
DEFENDANT'S MOTION TO EXCLUDE PLAINTIFF'S
OPINION WITNESS STEPHEN HOWES (Doc. 79)**

**I. INTRODUCTION**

This is a contract case. Plaintiff, Thompson I.G., L.L.C. ("Thompson"), a glass window manufacturer, is suing a former product supplier, Edgetech I.G., Inc. ("Edgetech"). The dispute is over a product manufactured by Edgetech and used in the assembly of Thompson's windows called the EPDM Super Spacer ("Super Spacer").[1] Super Spacer is a thermal foam resistant that separates two pieces of glass to a desired air space. As explained by Edgetech, when assembled in the final product, Super Spacer is held in place between two pieces of glass with an acrylic adhesive that draws down moisture into the airspace via the desiccated foam construction of the spacer. (Doc. 79 at 7, Edgetech's Mot. to Exclude Howes). Super Spacer is designed to keep warm air in and cold air out.

In this case, Thompson alleges that Edgetech breached its contract with Thompson,

---

[1] EPDM is an acronym for the compound ethylene propylene diene monomer, which is the material that makes the Super Spacer.

and breached implied and express warranties, by selling Thompson defective Super Spacers. Thompson purchased Super Spacers from Edgetech from 2004 through 2010. Thompson used the Super Spacers in the assembly of ten percent of the windows it sold to its customers. The remaining ninety percent of the windows manufactured by Thompson used aluminum spacers. A significant number of windows assembled with Super Spacer and sold to Thompson's customers, according to Thompson, have been returned, or warranty claims made, because the Super Spacer is defective.

Thompson's expert witness Stephen Howes credits the returned windows to a defect in Super Spacer. Edgetech disputes Howes's opinion. Edgetech's expert witness A. William Lingell opines that the windows were defective as a result of Thompson's poor workmanship and not a defect in Super Spacer.

Now before the Court are two motions filed by Edgetech:

Defendant's Motion for Spoliation and Fraud on the Court Sanctions (Doc. 77); and

Defendant's Motion to Exclude Plaintiff's Proffered Opinion Witness Stephen H. Howes (Doc. 79).

For the reasons that follow, the motion for spoliation and fraud on the Court sanctions is DENIED. The Court defers ruling on the motion to exclude Howes and will hold a hearing under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) prior to making a determination whether to exclude Howes's opinion.

## II. BACKGROUND

### A. General Background

The material facts are stated in a prior memorandum and order and are not repeated here. See (Doc. 52, Mem. and Order Granting Def.'s Mot. to Disqualify and Dismissing as

2

Moot Def.'s Mot. to Strike Pl.'s Expert). The facts related to the current motions are summarized below.

### B. Edgetech's First Request to Inspect Windows

The record reflects that Edgetech put Thompson on notice that it needed to preserve windows it claimed were damaged because of defective Super Spacer. In its first request for production of documents on August 12, 2011, Edgetech requested, among other things, that Thompson make available "All Thompson windows containing the Super Spacer product that Thompson alleges are defective (for inspection)." (Doc. 77-14 at 6, Edgetech's First Req. for Produc. of Docs.). Edgetech's first production of documents made clear that "[t]hese discovery requests are to be deemed continuing in nature. Any newly discovered or additional information responsive to these discovery requests should be supplied immediately upon coming to the attention of Thompson or its counsel." (*Id.* at 2).

### C. Thompson's Acknowledgment of Duty to Preserve Windows

The record also reflects that, as early as May of 2011, Thompson's upper-management recognized the importance of preserving returned windows assembled with Super Spacer. On May 23, 2011, Thompson's president, Russ Manser ("Manser"),[2] emailed Ron Manser[3] the following:

> [A]s you know we are in litigation with our Super Spacer manufacture[r], please communicate with your customers who [use] Super Spacer (Vinylsash, Sunaire, etc.) to try and remove seal-failed glass without breaking them, we have instructed shipping to forward all salvaged glass to Ed as he is in charge of future inspections.

---

[2] Manser is now retired.

[3] It is not clear from the parties' papers who Ron Manser is.

(Doc. 88-14 at 1, Internal Thompson Email from Russ Manser to Ron Manser).

Two months later, on August 30, 2011, Manser emailed Thompson's general manager, Lorne Flaig, informing her of the importance of preserving returned windows:

> It is very important to convey to your team that we must save all defective Super [] Spacer material along with any returned seal-failures. Please have a meeting with the department leaders and especially shipping.

(Doc. 83-15 at 1, Email Correspondence Between Manser and Flaig).

On the same day, Flaig responded to Manser:

> I have already instructed shipping and will also remind the supervisors in tomorrow morning[']s production meeting.

(*Id.*).

### D. The Howes Inspection

On December 17, 2012, Howes inspected five or six[4] windows assembled with Super Spacer that were returned to Thompson from its customers and stored at Thompson's Fenton, Michigan facility. These windows, according to Howes, were defective. See (Doc. 77-2 at 2-3, Exert from Howes's Report). At his deposition, Howes described the units he inspected:

> Q: I understand you looked at six [Super Spacer] units?
>
> A: They were up in an office, yeah.
>
> Q: Where in the office were they?
>
> A: Behind a desk. I think there was a window there, and they were behind a desk and we pulled them out.

---

[4] Howes's report says he inspected six units. However, he later stated in his affidavit that he only inspected five units.

. . .

Q: How many units were there?

A: I think there was six. I think there was five bigger ones and one small one.

Q: Approximately, do you know what the size were of the five larger ones?

A: Yeah. Forty inches square, something like that. Typical on a large window with mounting [sic] bars inside them.

Q: What was the size of the one smaller unit?

A: Twenty-seven, 28 inches by 15, something like that. It was a shaped unit, what you'd see in a vehicle.

(Doc. 77-3 at 3, Howes Dep.).

After inspecting the windows, among other things, Howes opined in a report that "it is very clear that the EPDM Super Spacer is out-gassing, shrinking in size and delaminating from the Mylar vapor barrier. . . It is not possible that anything Thompson could have done in the production would cause the failures. . . ." (Doc. 77-2 at 3, Exert from Howes's Report).

### E. Edgetech's First Inspection

Edgetech hired an expert, William Lingnell, to determine the cause of failure in Thompson's windows containing Super Spacer. Lingell was directed to inspect the same windows inspected by Howes and referenced in Howes's report. The parties scheduled an inspection at Thompson's Fenton, Michigan facility to take place on February 20, 2013. Two hours before the scheduled inspection, while Lingnell and Edgetech's counsel were en route by airplane to Thompson's facility, Thompson's counsel informed Edgetech representatives that five of the six windows may have been destroyed the night before by

a second-shift employee at Thompson.

Edgetech decided to proceed with the inspection of the remaining window at Thompson's facility. Upon arrival at Thompson's facility, Thompson's plant manager, Ed Wilson, informed Lingnell and Edgetech's counsel that he did not know if the other five windows were destroyed. Wilson further informed Edgetech personnel that he would follow up with Dekalita to determine what happened at the plant the night before. Edgetech inspected the smaller window referenced in Howes's report before leaving Thompson's facility.

Two days later, Thompson's counsel informed Edgetech that Thompson employees located the five missing windows originally thought to have been destroyed. Thompson submitted to the Court Dekalita's affidavit, in which he stated that he moved the units to a storage area without telling anyone. (Doc. 77-6, Dekalita Aff.). As explained by Thompson in its response brief:

> Sometime on February 18th or 19th, a second-shift employee, Zacharius Dekalita, was scheduled to clean the ink/print room where the I.G. units at issue were kept. Mr. Dekalita cleaned out the room, and being afraid that the IG units may get broken, or thrown out, boxed up the units and placed "do not destroy" stickers on them. The units were then placed in a loft above the printing room, Dekalita did not tell anyone he moved the units into that storage loft, and was not working at the plant at the time of the inspection.

(Doc. 83 at 8–9, Thompson's Resp. to Edgetech's Mot. for Spoilation and Fraud on the Court Sanctions).

Dekalita later overheard Thompson management "freaking out" about the missing windows, and he told them that he put the windows in a storage area. (Doc. 77-7 at 7, Dekalita Dep.).

6

The parties agreed to reschedule a second inspection to take place on March 22, 2013 and Thompson reimbursed Edgetech its attorneys' fees and expert costs in connection with the first inspection.

### F. Additional Warranty Claims

In February of 2013, prior to Edgetech's second scheduled inspection, Thompson received a warranty claim from its customer Oxbowindo for ten defective windows that were assembled with Super Spacer. (Doc. 83-3 at 6, Burmeister Dep.). Thompson sent Oxbowindo ten replacement windows and Oxbowindo returned to Thompson the ten defective windows. Thompson says it only received eight of the ten defective windows. After receiving the windows, Thompson placed a return merchandise authorization ("RMA") sticker dated March 8, 2013 on the windows. The date reflects when Thompson received the defective units back from Oxbowindo.

### G. Edgetech's Second Inspection

Edgetech arrived at Thompson's Fenton facility on March 22, 2013 to inspect the windows that were inspected by Howes. At the inspection, Thompson presented the eight windows that were returned by Oxbowindo on March 8; the plant manager Wilson represented these windows to be the same windows inspected by Howes in December of 2012.

However, during the inspection, Edgetech's counsel noticed the RMA label on one of the windows and attempted to photograph it. Wilson removed the label and started to walk away. When confronted by Edgetech's counsel, Wilson refused to let counsel photograph the label. Eventually Wilson complied. The label contained the date "3/8/13," which Edgetech's counsel later learned at the deposition of Thompson sales representative

Paul Lewis meant that the windows Edgetech was inspecting were returned to Thompson around March 8, 2013, well after Howes performed his inspection of the six windows. Wilson, on the day of the second inspection, stated that the label was inadvertently placed on the windows.

At his deposition on April 3, 2013, Wilson's story changed and he testified that it was a mistake when he told Edgetech representatives that the windows available for inspection at the second inspection were the same windows inspected by Howes. Wilson explained that the windows provided for inspection at the second inspection were the windows returned by Oxbowindo around March 8, 2013. (Doc. 77-9 at 9–10, Wilson Dep.). Wilson stated that these Oxbowindo windows were stored with the windows inspected by Howes because they too were assembled with Super Spacer and were returned to Thompson under warranty claims. Wilson further explained that, although all of the windows were stored together, he did not realize that on the day of inspection, he failed to provide Edgetech with the windows that were inspected by Howes. (*Id.* at 10).

### H. Thompson's Employee Testimony

#### 1. President Manser

Edgetech took the deposition of Thompson's then-president Manser. Manser explained that, since the lawsuit was filed, Thompson's customers collectively returned approximately 25-30 windows assembled with Super Spacer to Edgetech per month under warranty claims. (Doc. 77-11 at 4, Manser Dep.). Specifically, Manser stated that "we [Thompson] continue to get units in every week, every month. So going forward we are retaining many, many samples for trial." (*Id.*).

However, Manser testified that, because of changes in the ownership of Thompson,

the bulk of the windows returned to Thompson were thrown away in the "trash compactor at Thompson I.G." as normal company protocol. (*Id.* at 4). According to Manser, it was not until March of 2013 that he "put the brakes" on Thompson's practice of throwing returned windows in the trash. (*Id.*). Although Manser approximated that 375 windows were returned as defective, he testified that he did not take any photographs or videos of the windows prior to Thompson's throwing them away. (*Id.* at 4–5).

### 2. Employees Lewis and Dekalita

Thompson employees Paul Lewis and Dekalita confirmed that Thompson routinely and in the normal course of business threw away windows that were returned to Thompson under warranty claims from its customers. Indeed, at his deposition on April 3, 2013, Lewis confirmed that after Thompson processed warranty claims, the units were disposed of in the trash:

> Q: Now, how many warranty claims have you processed since your new owner took over under this RMA process, if you know?
>
> A: Oh, quite a few. It's probably I'd say over a hundred. Between all – all of the sales representatives.
>
> Q: And what's your customary practice after you log these windows in? What do you do with them after that?
>
> A: Then our quality department looks at them and decides, yes, they are defective, issue a credit, and then they are disposed of.
>
> Q: And how are they disposed of?
>
> A: Usually just in like our dumpster, our hopper. Or if they are big units, possibly – we might try to save it, but very often – very seldom they do in terms of one piece of glass, it might possibly be able to save something. But usually seal failures they're stained and you can't do

9

> nothing with it, so it's just basically just thrown away.
>
> Q: And do you recall ever receiving any type of notice at Thompson that they were not to throw away any glass units that had the Super Spacer in them?
>
> A: That was kind of – about the last two months, they wanted us to start saving all the Super Spacer units.
>
> Q: And was that via like an e-mail to the group or was there a meeting or how did that take place?
>
> A: That I believe was a meeting between – I'm not sure how that came into effect, because basically the sales reps didn't know nothing about it. That would have been probably between the plant manager and our quality department.

(Doc. 77-12 at 8, Lewis Dep.).

Dekalita confirmed at his deposition that sales representatives were not told to preserve the returned windows containing Super Spacer until the middle of January, 2013. (Doc. 77-7 at 7, Dekalita Dep.).

### I. The "Warranty Report"

Thompson management prepared a "Warranty Report" which provides a list of windows containing Super Spacer that were the subject of warranty claims made to Thompson by its customers. The list contains 277 windows that were covered under warranty claims. None of these windows were made available for inspection by Edgetech.

Thompson represents that it did not destroy the returned windows included in the Warranty Report. Rather, Thompson says its customers never returned the majority of the defective windows because they were destroyed in the field by the customer.

### J. Edgetech's Third Inspection

Edgetech scheduled a third inspection at Thompson's Fenton facility on April 22,

2013. Edgetech again sought to inspect the windows that Howes referenced in his report. At the April 22 inspection, Thompson provided for inspection four windows that Edgetech says were different in shape, size and characteristic from the ones described by Howes at his deposition. Further, until this inspection, Edgetech believed there were five, not four, windows that remained uninspected by its personnel.

Thompson disputes Edgetech's representation that the windows provided to Edgetech at the April 22 inspection were different than the ones Howes inspected. Thompson says that Edgetech inspected the same windows that Howes inspected.

### K. Howes's Affidavit

On May 10, 2013, Howes signed an affidavit to which he attached for the first time pictures of "all of the units that I [Howes] inspected with Ed Wilson at Thompson I.G. on December 17, 2012." (Doc. 83-8 at 1, Howes Aff.). Howes stated that, "My report states that I inspected 6 units and that was an error, there were only 5 units." (*Id.*).

The pictures provided with Howes's affidavit were not provided to Edgetech as part of Howes's expert report. Indeed, the first time Edgetech was aware that Howes had taken pictures of the windows he inspected was when he submitted his affidavit as an exhibit to Thompson's response brief to this motion.

Howes also stated in his affidavit, contrary to his deposition testimony, that only one of the windows he inspected had a Muntin Bar, which is a decorative bar or grid in the window.

### L. Wilson's Affidavit

On May 16, 2013, Wilson signed an affidavit explaining that, at Edgetech's third inspection, its representatives examined the same windows that Howes examined in

December of 2012. (Doc. 83-9 at 1, Wilson Aff.). Attached to Wilson's affidavit are pictures of the windows that he says he took prior to Howes's inspection. (*Id.*). These pictures were not provided to Edgetech prior to Thompson's filing of its response brief to this motion.

Wilson also stated in his affidavit that, starting in the Spring of 2011 and until the present date, he has advised employees that defective windows containing Super Spacer be brought to his attention and that they be preserved because of this pending case. (*Id.* at 2).

### III. DISCUSSION

In its motion for spoilation and fraud on the Court sanctions, Edgetech argues that the Court should dismiss this case due to what Edgetech frames as Thompson's "intentional destruction of evidence." While the record supports the view that Thompson has been sloppy in the way it has handled the preservation of windows containing Super Spacer, Edgetech has not been prejudiced. Indeed, Thompson has only made it more difficult for it to prove its own case. The Court will not dismiss the case or issue a different spoilation sanction. Nor will the Court exclude Howes on the sole basis that Edgetech says it has not been able to inspect the same windows that Howes inspected. However, the Court will hold a *Daubert* hearing to determine whether Howes is otherwise qualified to give an expert opinion.

#### A. Motion for Spoilation Sanctions

#### 1. Legal Standard

"A proper spoilation sanction serves both fairness and punitive functions." *Johnson v. Metro. Gov't of Nashville and Davidson Cnty., Tenn.*, 502 F. App'x 523, 531 (6th Cir.

2012) (citing *Adkins v. Wolever*, 554 F.3d 650, 652 (6th Cir. 2009) (en banc)). District courts have broad discretion in determining whether spoilation sanctions are appropriate. *Id.* (citing *Adkins*, 554 F.3d at 652). Indeed, "it is within a district court's inherent power to exercise broad discretion in imposing sanctions based on spoliated evidence." *Adkins*, 554 F.3d at 653.

Sanctions can include, among other things, dismissing the case, granting summary judgment, or "imposing an adverse inference based on the lost or destroyed evidence." *Johnson*, 502 F. App'x at 531. The Sixth Circuit employs a three-part test in determining whether sanctions are appropriate:

> [A] party seeking an adverse inference instruction based on the destruction of evidence must establish (1) that the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the records were destroyed "with a culpable state of mind;" and (3) that the destroyed evidence was "relevant" to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense.

*Id.* at 531–32 (citation omitted).

A defendant's stated reasons for destroying evidence is a credibility issue; the district court is entitled to great deference in making such determinations. *Beaven v. U.S. Dept. Of Justice*, 622 F.3d 540, 554 (6th Cir. 2010).

### 2. This Case

Assuming that multiple windows containing Super Spacer returned to Thompson were destroyed by Thompson, it did not do so with a culpable state of mind. Accordingly, spoilation sanctions are not warranted.

A culpable state of mind, the Sixth Circuit has explained, "depends on the alleged

spoliator's mental state regarding any obligation to preserve evidence and the subsequent destruction." *Beaven v. U.S. Dept. of Justice*, 622 F.3d 540, 553 (6th Cir. 2010). "[T]he 'culpable state of mind' factor is satisfied by a showing that the evidence was destroyed 'knowingly, even if without intent to [breach a duty to preserve it], or *negligently*.'" *Id.* at 554 (alterations and emphasis in original) (citation omitted).

Here, to the extent that windows returned to Thompson containing Super Spacer were thrown away, it was not done with a culpable state of mind. The record does not support a finding that Thompson intentionally destroyed windows to seek a tactical advantage in this case. To the contrary, to the extent that any windows were destroyed, Thompson's case is now harder to prove.

Further, the record reflects that Thompson's upper management sought to safeguard the windows early on in the case. Shortly after the case was filed, Thompson's president instructed Thompson's general manager by email to inform employees to preserve all returned windows containing Super Spacer. The general manager acknowledged the email and informed the president that she had already instructed the proper personnel to safeguard the returned windows.

Thompson also says that multiple windows were not physically returned to it; the windows were thrown away by Thompson's customer without further inquiry by Thompson. Although this shows sloppiness on Thompson's part, it does not rise to the level of a culpable state of mind.

Finally, and most importantly, Edgetech cannot show that it was prejudiced by any failure on behalf of Thompson to preserve returned windows containing Super Spacer. Edgetech's expert, Lingnell, was able to form an opinion as to the cause of failure in

Thompson's windows without regard to any windows that may have been thrown away. In Lingnell's report, he stated that he "had the opportunity to review and study documents, test reports, depositions, e-mails, correspondence, attend depositions, examine insulating glass units, review glazing systems, and literature prepared by [Thompson]." (Doc. 86-8 at 2, Lingnell Report). Although Lingnell stated in his report that, "[i]t would have [been] beneficial to have representative samples of the" windows containing Super Spacer which Thompson threw away "to examine and study . . . their cause(s) of failure," it did not preclude him from forming his opinion. (*Id.* at 10). Indeed, in Lingnell's report, he concluded "with a high degree of engineering certainty" that Thompson experienced problems with its windows due to its own poor workmanship. Because Lingnell was able to form an opinion without inspecting the windows containing Super Spacer that Edgetech says were destroyed by Thompson, Edgetech has not been prejudiced and spoilation sanctions are unwarranted.

### B. Motion to Exclude Howes

Next, Edgetech says that Howes should be excluded as a witness because he does not satisfy the standard to give an expert opinion set forth by the Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) and Fed. R. Evid. 702.

### 1. Legal Standard

Under Fed. R. Evid. 702, an expert must be "qualified . . . by knowledge, skill, experience, training, or education," and offer an opinion that is (a) helpful to the trier of fact; (b) based on sufficient facts and data; (c) based on reliable principles and methods; and (d) reliably applies the principles and methods to the facts of the case.

*Daubert* establishes that district courts are gatekeepers of expert testimony. 509

U.S. at 589; see also *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999). "In *Daubert*, the Supreme Court held that trial judges were required to make an initial determination 'of whether the reasoning or methodology underlying [an expert's] testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue.'" *Greenwell v. Boatwright*, 184 F.3d 492, 496 (6th Cir. 1999) (citing *Daubert*, 509 U.S. at 592–93). This involves a two-step inquiry. *Id.* The first step ensures that "there is a 'fit' between the testimony and the issue to be resolved by the trial." *Id.* (citation omitted). In other words, the testimony must be relevant to the issues to be resolved by the trial. The second step ensures that the methodology and principles underlying the expert's testimony are reliable. *Id.* at 496–97.

The Sixth Circuit has stated that "the trial court is not required to hold an actual hearing to comply with *Daubert*." *Id.* at 498. However, "the court is required to make an initial assessment of the relevance and reliability of the expert testimony." *Id.*

### 2. This Case

The parties have fully briefed whether Howes is qualified to give an expert opinion in this case. Edgetech argues that Howes should not be permitted to testify because he does not have the necessary experience. Further, Edgetech says that Howes's opinions are based on assumptions and untested hypotheses.

Thompson disagrees. Thompson says that Howes's forty years of experience in the insulated glass industry make him well-qualified to give an expert opinion in this case. In addition, Thompson says that Edgetech's attack on the reliability of Howes's opinion is essentially an attack on Howes's credibility, and that this determination must be made by the jury.

To satisfy itself that Howes has the necessary education, training and experience, and that his opinion is based on that education, training and experience, the Court will hold a *Daubert* hearing prior to deciding the motion.

### IV. CONCLUSION

For the reasons stated above, Edgetech's motion for sanctions was denied. The Court will hold a *Daubert* hearing prior to deciding whether to exclude Howes's opinion.

SO ORDERED.

    S/Avern Cohn
AVERN COHN
UNITED STATES DISTRICT JUDGE

Dated: July 3, 2013

I hereby certify that a copy of the foregoing document was mailed to the attorneys of record on this date, July 3, 2013, by electronic and/or ordinary mail.

    S/Sakne Chami
Case Manager, (313) 234-5160

17